LAW OFFICE OF FELIX VINLUAN
Felix Q. Vinluan (FV6788)
69-10 Roosevelt Avenue, 2nd Floor
Woodside, NY 11377
Tel. No. 718-478-4488
Fax No. 718-478-4588
*Attorneys for the Plaintiffs*

FILED
CLERK

2016 FEB -3  AM 11: 45

U.S. DISTRICT COURT
EASTERN DISTRICT
OF NEW YORK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------x

LUIS I. BELVIS, RAUL F. DE LEON,
and CYD RICH C. RECENTE,

                                   *Plaintiffs*,

     - against -

RALPH COLAMUSSI, HISTORICAL
THATCHED COTTAGE CATERERS, INC.,
JOE'S FRIENDLY SERVICES & SON, INC.,
d/b/a HISTORICAL THATCHED COTTAGE,
and ROBERTO VILLANUEVA,

                            *Defendants*.

-----------------------------------------------------------------------x

**BIANCO, J.**

Docket No. _____

**LINDSAY, M.J.**

COMPLAINT

Trial by Jury Demanded

     **Plaintiffs** LUIS I. BELVIS, RAUL F. DE LEON, and CYD RICH C. RECENTE, by undersigned counsel, respectfully allege as follows:

### PRELIMINARY STATEMENT

     1.    This action arises out of Defendants' scheme to defraud Plaintiffs through false representations resulting in the forced labor, human trafficking and wage exploitation of the Plaintiffs by Defendants.

     2.    Plaintiffs allege that Colamussi and Villanueva conspired to fraudulently recruit them from the Philippines or Dubai to work as H-2B guest workers for Colamussi's business establishments in Long Island, and forced them to work overtime hours without proper

1

compensation, and accept deplorable living conditions.  Plaintiffs were pressured to comply with Defendants' demands through threats of loss of immigration status, cancellation of immigration sponsorship, deportation, and loss of work.  As a result, Plaintiffs allege they had no choice other than to obey their orders and continue working.

3.      Plaintiffs assert claims arising from violations of their rights under the Trafficking Victims Protection Act (18 U.S.C. §1589 and 18 U.S.C. §1590); and Alien Tort Statute (28 U.S.C. §1350).

**JURISDICTION AND VENUE**

4.      This Court has jurisdiction pursuant to 18 U.S.C. §1595(a), a federal question, this action arising under the Trafficking Victims Protection Act (TVPA); and by 28 U.S.C. §1350, this action arising under the Alien Tort Statute.

5.      Supplemental jurisdiction over Plaintiffs' state law claims is conferred by 28 U.S.C. § 1367(a), because these claims are so closely related to Plaintiff's federal claims that they form part of the same case or controversy.

6.      Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in the Eastern District of New York.   Venue is proper pursuant to 18 U.S.C. §1965.

**PARTIES**

7.      Plaintiff Luis I. Belvis ("Belvis") is a citizen of the Philippines.  He entered the United States lawfully sometime on September 19, 2012 with an H-2B visa to perform labor.  He presently resides in Queens County, state of New York, within this District.

8.      Plaintiff Raul F. De Leon ("De Leon") is a citizen of the Philippines.  He entered the United States lawfully sometime on December 16, 2013 with an H-2B visa to perform labor. He presently resides in Washoe County, state of Nevada.

9.      Plaintiff Cyd Rich C. Recente ("Recente") is a citizen of the Philippines.  She entered the United States lawfully sometime on October 8, 2014 with an H-2B visa to perform labor.  She presently resides in Queens County, state of New York, within this District.

10.     Defendant Ralph Colamussi ("Colamussi") is an adult individual residing in Suffolk County, state of New York, within this District.

11.     Upon information and belief, Colamussi is the owner or President or chief executive officer, or manager of corporate defendants, Historical Thatched Cottage Caterers, Inc. and Joe's Friendly Services & Son, Inc.

12.     Defendant Historical Thatched Cottage Caterers, Inc. ("Thatched Cottage Caterers") is, upon information and belief, a business corporation duly organized and existing under the laws of the state of New York, and maintains an office at 34 Dewey Street, Huntington, NY, within this District.

13.     Defendant Joe's Friendly Services & Son, Inc. ("Joe's Friendly Services") is, upon information and belief, a business corporation duly organized and existing under the laws of the state of New York, and maintains an office at 445 East Main Street, Centerport, NY, within this District.  Likewise upon information and belief, Joe's Friendly Services does business as Historical Thatched Cottage.

14.     Upon information and belief, the corporate Defendants were, at all times relevant, engaged in the restaurant and/or catering business.

15.     Defendant Roberto Villanueva ("Villanueva") is an adult individual who, upon information and belief, last resided in Suffolk County, state of New York.  He is the lead defendant in a similar human trafficking case entitled "Magnifico et al. v. Villanueva et al.", Docket No. 10-cv-80771 in the Southern District Court of Florida.

16.     Upon information and belief, Villanueva was an agent, employee or representative of Colamussi and/or his companies.

17.     At all times relevant to this action, each of the above-named Defendants was an "employer" of Plaintiffs Belvis and De Leon within the meaning of the New York Labor Law, N.Y. Lab. L. §§ 190 *et seq.*  and 650 *et seq.*

18.     At all times relevant to this action, Plaintiffs Belvis and De Leon were "employees" of each Defendant within the meaning of the New York Labor Law, N.Y. Lab. L. §§ 190 *et seq.*  and 650 *et seq.*

19.     Upon information and belief, at all times relevant, Colamussi and/or Villanueva determined Plaintiffs' places of employment, established the terms of their employment, controlled their work schedules and supervised their work.

## STATEMENT OF FACTS

### I.     Common Allegations:

20.     During 2012 through 2014, Defendants Colamussi and Villanueva, directly and through their agents, recruited Plaintiffs from the Philippines and Dubai (United Arab Emirates) to perform work in the United States.

21.     Colamussi and Villanueva recruited guest workers from the Philippines and Dubai under the H-2B visa program.   During the recruitment, Colamussi and Villanueva provided Plaintiffs (and other recruits) with false and misleading information about the terms and

conditions of their employment and required them to incur significant debts. Colamussi and Villanueva also misled the U.S. government by providing inaccurate information on the H-2B visa applications and on the Department of Labor certification forms submitted for Plaintiffs (and other H-2B workers), including the location and amount of work and pay.

22.     Colamussi and Villanueva, directly or through their Philippine-based agents, required Plaintiffs to pay money as and by way of placement fee for the H-2B processing. Plaintiffs had to borrow money from lenders and relatives to raise these placement fees.

23.     Colamussi and Villanueva obligated Plaintiffs Belvis and De Leon (and the other H-2B recruits) to reside in unsafe and inadequately heated housing accommodation that was strictly controlled by Colamussi.  Once employed by Colamussi and his companies, Plaintiffs (Belvis and De Leon) were monitored, intimidated, threatened, and forced to live in unsafe housing and forced to continue to work without proper compensation.

24.     Defendants gained and maintained control over Plaintiffs by actively promoting the impression that those who did not obey them would be made to suffer the consequences, such as withdrawal of immigration sponsorship and/or deportation.

25.     Defendants also used false promises of immigration status extension or sponsorship to retain Plaintiffs and to maintain control over them.

26.     Plaintiffs felt compelled to continue working for Defendants, despite their not knowing what happened to their immigration sponsorship or status.

27.     Because of the conditions of coercion and control imposed upon them by Defendants, and as a result of Defendants' exploitation and broken promises, Plaintiffs' exhaustion, emotional distress and financial hardships became so intolerable they eventually mustered the courage and realized that they had to escape from their work conditions.

28.     Plaintiffs suffered emotional distress, financial distress, and harm to their immigration status due to both the Defendants' coercive tactics and Plaintiffs' resulting forced labor and/or trafficking.

29.     The emotional effects suffered by Plaintiffs included disrupted sleeping, nightmares, ongoing feelings of fear, difficulty developing trust, anxiety, depression, difficulty concentrating and stress.

## II.     As to Plaintiff Belvis:

30.     Sometime in early 2012, Defendant Villanueva contacted Belvis in the Philippines and offered him a job as a waiter/server at a restaurant in the United States.

31.     Villanueva and Belvis met at a hotel in Quezon City, Philippines, where Villanueva explained to Belvis that Belvis had to pay the US Embassy visa application fee, the medical examination fee, and the Philippine Overseas Employment Administration (POEA) fee.

32.     Sometime in June 2012, Villanueva represented to Belvis that his US principal, Defendant Colamussi, had secured an approved H-2B petition for eleven workers.  Villanueva told Belvis that he would forward to him the offer of employment from Colamussi's company, Thatched Cottage Caterers.

33.     On or about September 4, 2012, Belvis signed the offer of employment which was already signed by Colamussi as of August 30, 2012.

34.     The offer of employment stated that Belvis would work at Historical Thatched Cottage as a waiter/server for the season that would end on December 31, 2012.  Thatched Cottage agreed to pay Belvis' travel expenses, and offered him an hourly rate of $8.04, at a guaranteed forty (40) hours of work per week.   Thatched Cottage likewise agreed to provide Belvis free food during his days of work.

35     On September 6, 2012, the U.S. Embassy in Manila granted Belvis his H-2B visa to enter and work in the United States under the sponsorship of Thatched Cottage Caterers.

36.    On September 19, 2012, Belvis arrived in New York, where he was met at the airport by Villanueva.  Villanueva immediately brought him and introduced him to Colamussi in the latter's restaurant in Long Island, New York.

37.    Colamussi directed Belvis to start working, not at Thatched Cottage by the Bay restaurant, but at Jelly Fish Restaurant, which he claimed he likewise owned.

38.    Colamussi and Villanueva instructed Belvis to bring his belongings to an apartment in nearby Huntington, New York, which he would share with four other Filipino H-2B workers.  Belvis was told to pay $200 a month as payment for his rent.

39.    Belvis was assigned by Colamussi to work in the kitchen of the Jelly Fish restaurant.  He was also told to assist in washing the dishes.  When his job was finished at the Jelly Fish restaurant, there were many occasions when he was also directed by Colamussi to go to the nearby Thatched Cottage restaurant to assist in washing the dishes as well.

40.    Before Belvis' H-2B status expired on December 31, 2012, Colamussi and Villanueva discussed with him that he would have to change his H-2B status to F-1 status in the meantime, but that they promised him they would sponsor him as an H-1B worker on April 1, 2013, when the H-1B filing season would start.

41.    Not knowing U.S. immigration laws, Belvis put his trust on his employers and agreed to Defendants' recommendations, and had his H-2B status changed to F-1 status. Villanueva required Belvis to borrow money in the amount of ten thousand dollars ($10,000) as a show money in his bank account so that his F-1 status would be approved.

42.    Starting in early 2013, Belvis was sometimes not paid on time by the Defendants. Although he regularly worked more than forty hours per week, he was not paid all his hours of work.  Sometimes, his payroll checks bounced or did not clear the bank.

43.    Defendants used the checks of the corporate Defendants, as well as of Catering Management Services, another company allegedly also owned by Colamussi, to pay Belvis' wages.

44.    Belvis complained to Villanueva about the bounced checks, but Villanueva told him not to mind the late payments, so long as he was getting paid anyway.

45.    In the summer of 2013, Colamussi brought Belvis to stay at his house at 332 Elwood Road in East Northport, NY.  Colamussi made Belvis stay at his basement, where there was no hot water and no sufficient heating.

46.    Since then, Colamussi made Belvis work for him early mornings by having him do the groceries for his restaurants.

47.    Because of the added marketing responsibilities, Belvis complained to both Colamussi and to Villanueva that he was not getting paid his wages properly, and that he had been working extra without any compensation.

48.    Defendants replied that Belvis should feel grateful that he was being given a job and that he was receiving compensation to send to his family in the Philippines.

49.    Defendants likewise reminded Belvis that he was being sponsored as an H-1B employee, and that he owed them his status to continue staying and working in the United States. They told Belvis that if he continued on complaining, they would cancel his immigration sponsorship, and he would lose his immigration status and could get deported.

50. When told that he could lose his immigration status to continue working in the United States, Belvis felt that he should stop complaining, and that he had no choice but to continue working for the Defendants.

51. Starting April 2014, Belvis was no longer getting paid by Defendants, despite his continuing to work for them for more than forty hours per week.

52. In May 2014, more than a year after he was supposedly sponsored as an H-1B employee, Belvis confirmed that Defendants did not really sponsor him as an H-1B employee, as Defendants could not produce any document to prove they changed his F-1 status to H-1B status.

53. Sometime on or about June 10, 2014, realizing that Defendants misrepresented to him his being sponsored as an H-1B employee, and that Defendants had not paid him for three months already, Belvis decided to leave Defendants' employment and Colamussi's house.

## III.   As to Plaintiff De Leon:

54. Sometime in the summer of 2013, De Leon was recruited by Defendant Villanueva and his Philippine-based associates to work as a waiter for Defendant Historical Thatched Cottage.

55. During a meeting at hotel in Quezon City, Philippines, Villanueva explained to De Leon that he had to pay the amount of three thousand dollars ($3,000) as and by way of recruitment fee for him and his associates.

56. Desirous to work abroad, De Leon borrowed money from family and friends to be able to pay Villanueva and his associates the amount of $3,000 as recruitment fee.

57. Villanueva represented to De Leon that his US principal, Defendant Colamussi, had secured an approved H-2B petition for nineteen workers.  Villanueva told De Leon that he

would forward to him the offer of employment from Colamussi's company, Joe's Friendly Service & Son, Inc., doing business as Historical Thatched Cottage.

58.     On November 29, 2013, the U.S. Embassy in Manila granted De Leon his H-2B visa to enter and work in the United States under the sponsorship of Joe's Friendly Service & Son, Inc.

59.     On or about December 12, 2013, De Leon signed the offer of employment which was already signed by Colamussi as of October 2, 2013.

60.     The offer of employment stated that De Leon would work at Historical Thatched Cottage as a waiter for the season that would end on December 31, 2013.  Thatched Cottage agreed to pay De Leon's travel expenses, and offered him an hourly rate of $12.02, at a guaranteed forty (40) hours of work per week.   Thatched Cottage likewise agreed to provide De Leon free food during his days of work.

61.     On December 16, 2013, De Leon, together with another H-2B employee named Mark Hernandez, arrived in New York, where they were met at the airport by Villanueva. Villanueva immediately brought them and introduced them to Colamussi in the latter's restaurant in Long Island, New York.

62.     Colamussi directed De Leon to start working, not at Thatched Cottage by the Bay restaurant, but at Jelly Fish Restaurant, which he claimed he likewise owned.

63.     Colamussi and Villanueva brought De Leon to reside at the basement of Colamussi's house in East Northport, New York, where there was no hot water and no sufficient heating.

64.     De Leon was assigned by Colamussi to work as a dishwasher at the Jelly Fish restaurant.  When his job was finished at the Jelly Fish restaurant, there were many occasions

when he was also directed by Colamussi to go to the nearby Thatched Cottage restaurant to assist in washing the dishes as well.

65.    Before De Leon's H-2B status expired on December 31, 2013, Colamussi and Villanueva promised him that they would extend his H-2B status, so long as he continued working for them.

66.    Being new in the country and not knowing immigration laws, De Leon thanked the Defendants for their promise to extend his H-2B status and, in return, promised them that he would be a hardworking employee.

67.    As soon as he started working for the Defendants, De Leon averaged more than forty hours of work every week.  In addition to doing dishwashing work in both Jelly Fish and Thatched Cottage restaurants, De Leon was also required by Colamussi to remove the snow and/or ice from the gutter or roofs of the two restaurants.

68.    Sometime in late January 2014, De Leon noticed that his pay checks started to bounce or not getting cleared by his bank.

69.    De Leon complained to both Colamussi and Villanueva that he was getting charged by his bank for the bounced checks.  He also complained to Defendants that he should be getting paid for all his hours of work.

70.    Defendants used the checks of the corporate Defendants, as well as of Catering Management Services, another company allegedly also owned by Colamussi, to pay De Leon's wages.

71.    Defendants replied that De Leon should feel grateful that he was being given a job and that he was receiving compensation, no matter that it was late, so that he could send money to his family in the Philippines.

72.     Defendants likewise reminded De Leon that he was being sponsored as an H-2B employee, and that he owed them his status to continue staying and working in the United States. They told De Leon that if he continued on complaining, they would cancel his immigration sponsorship, and he would lose his immigration status and could get deported.

73.     When told that he could lose his immigration status to continue working in the United States, De Leon felt that he should stop complaining, and that he had no choice but to continue working for the Defendants.

74.     But immediately thereafter, all the subsequent pay checks that De Leon received from Defendants all bounced.  De Leon did not deposit some checks as doing so would just cause him more bank charges.

75.     In April 2014, De Leon, despite not liking to become unlawfully present if his employer withdrew his H-2B sponsorship, confronted Colamussi and demanded that he be paid all his unpaid hours of work, which at that time, included three months of uncompensated work, not counting overtime hours that were not paid.

76.     Colamussi could not give De Leon a straight answer when he would make good on the bounced checks and when he would pay De Leon all his hours of work.

77.     Without even knowing if his H-2B status was indeed filed and/or approved, De Leon decided to quit his employment and left Colamussi's house.  He could no longer continue working without getting paid.

**IV.      As to Plaintiff Recente:**

78.     Sometime in June 2014, Defendant Villanueva met Recente's father in Riverhead, New York.

79.     Villanueva came to learn that both he and Recente's father originally came from the Visayan region in the Philippines. In their discussion, Villanueva also learned that Recente had two daughters who were working in Dubai, United Arab Emirates.

80.     Villanueva asked Recente's father if the latter wanted his daughters to join him here in the United States.

81.     Recente's father answered affirmatively, and Villanueva lost no time in explaining that he had been getting Filipino temporary workers to come and work in a New York restaurant. He particularly mentioned that he had brought to eastern Long Island several Filipino workers to work at a restaurant called Thatched Cottage.

82.     Villanueva informed Recente's father that he could bring the latter's daughters to New York for a fee of three thousand dollars ($3,000) for each daughter's sponsorship. He allegedly worked for the owner of Thatched Cottage which was sponsoring Filipino servers to come and work in the Long Island restaurant.

83.     Recente's father managed to come up with $3,000 in July 2014 so that his elder daughter (Tiffany Rose) would be sponsored through Villanueva's restaurant-employer.

84.     In late July 2014, Recente's father borrowed money from lenders to raise the amounts of $1,500 and also $2,000 to give to Villanueva, so that his younger daughter (Cyd Rich) would also be sponsored through Villanueva's restaurant-employer.

85.     Villanueva directed Recente's father to advise her two daughters to leave their employment in Dubai and to go back to their native Philippines in preparation for their U.S. visa interview.

86.     On July 15, 2014, the two Recente daughters left their employment in Dubai and went back to the Philippines.

87.     Villanueva's associates in the Philippines met with the Recente siblings and advised them to undergo training as waitresses/servers so that they would be prepared when they finally would work in Long Island.

88.     The Philippine associates of Villanueva made the Recente siblings work in Manila restaurants for almost two months.  They also required them to stay and reside at their office while they were working at the restaurants.

89.     Although the Recente siblings did the job of regular waitresses employed by the Manila restaurants, they were not compensated at all.

90.     After a month of working without pay, the Recente siblings demanded to be paid for their time and services.  Villanueva's associates informed them that their work was part of the deal for their sponsorship, and that if they really wanted to go to work in the United States, they should continue working for the Manila restaurants, which, upon information and belief, were owned by one of Villanueva's associates.

91.     After being threatened that their U.S. sponsorship could be jeopardized because they had complained, the two Recente siblings stopped complaining, and just continued working for another month, as they did not want to lose the opportunity to work in the United States.

92.     After waiting for more than two months for their visa interview, which included their working without pay for the restaurants of Villanueva's associate, and even staying at the office of Villanueva's Philippine associates, the Recente siblings could not still be given a definite date for their visa interview.

93.     In New York, Recente's father became apprehensive and contacted Villanueva regarding the delay in the visa interview schedules.  Villanueva promised that he would

immediately discuss with his Philippine-based associates so that they could schedule the siblings for visa interview.

94.     On September 30, 2014, the Philippine-based associates of Villanueva told Recente (Cyd Rich) that only she was scheduled for interview.

95.     Villanueva sent Recente documentation regarding her H-2B sponsorship.  This documentation included the final determination by the U.S. Department of Labor approving Joe's Friendly Service & Son, Inc.'s labor certification application for fifteen (15) servers.  The offered wage rate for each server was $10.59 per hour.

96.     On October 1, 2014, the U.S. Embassy in Manila granted Recente her H-2B visa to enter and work in the United States under the sponsorship of Joe's Friendly Service & Son, Inc.

97.     On October 8, 2014, Recente arrived at the JFK Airport in New York, expecting to be met at the airport by Villanueva as they had previously agreed upon.

98.     Villanueva did not show up at the airport, but fortunately, Recente's father was available and decided to meet her there.

99.     Recente and her father contacted Villanueva many times, but Villanueva did not return their calls, until sometime in November 2014 when Villanueva finally decided to meet with them.

100.     Villanueva even assisted Recente to open up a Chase bank account so that she would allegedly have an identification in America.

101.     Recente informed Villanueva that her H-2B status was valid only until December 31, 2014.  She likewise inquired when she could start working.

102.    Villanueva could not answer when Recente would definitely start working.  He merely asked Recente to be patient and to wait.  He also promised Recente that he would work on the extension of her H-2B status.

103.    After that one meeting with Recente and her father, Villanueva never showed himself nor communicated to Recente again.

## FIRST CAUSE OF ACTION

### Trafficking Victims Protection Act of 2003 ("TVPA")
### Forced Labor, 18 U.S.C. §1589

104.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 103 as if set forth fully herein.

105.    Plaintiffs bring this claim against all the Defendants.

106.    This claim is brought under 18 U.S.C. §1595 of the Trafficking Victims Protection Act.

107.    Defendants subjected Plaintiffs to forced labor in violation of 18 U.S.C. §1589.

108.    Defendants knowingly provided and obtained Plaintiffs' labor and services by subjecting Plaintiffs to threats of serious harm, including loss of immigration status and deportation by immigration and law enforcement officials, in violation of 18 U.S.C. §1589(2).

109.    By threatening Plaintiffs with loss of immigration status and deportation by immigration and law enforcement officials, Defendants obtained the labor of Plaintiffs through abuse and threatened abuse of law and the legal process in violation of 18 U.S.C. §1589(3).

110.    Defendants knowingly provided and obtained Plaintiffs' labor and services by using a scheme, plan and pattern intended to cause Plaintiffs to believe that, if they left Defendants' employ, they would suffer serious harm or physical restraint, in violation of 18 U.S.C. §1589(4).

111.    As a result of the above violations, Plaintiffs suffered damages.

112.    Plaintiffs are entitled to compensatory and punitive damages in an amount to be proven at trial and any other relief deemed appropriate, including reasonable attorney's fees.

### SECOND CAUSE OF ACTION

**Trafficking Victims Protection Act of 2003 ("TVPA")**
**Human Trafficking, 18 U.S.C. §1590**

113.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 103 as if set forth fully herein.

114.    Plaintiffs bring this claim against all the Defendants.

115.    This claim is brought under 18 U.S.C. §1595 of the Trafficking Victims Protection Act.

116.    Defendants knowingly recruited, harbored, and transported Plaintiffs for the purpose of subjecting them to forced labor in violation of 18 U.S.C. §1590.

117.    Defendants recruited Plaintiffs Belvis and De Leon from within the Philippines, housed them in Defendant-controlled housing, and transported them to Long Island, New York, for the purpose of subjecting them to forced labor.

118.    Defendants recruited Plaintiff Recente from Dubai, housed her in Defendant-controlled housing, and transported her to the Philippines, and also to Long Island, New York, for the purpose of subjecting her to forced labor.

119.    As a result of the above violations, Plaintiffs suffered damages.

120.    Plaintiffs are entitled to compensatory and punitive damages in an amount to be proven at trial and any other relief deemed appropriate, including reasonable attorney's fees.

### THIRD CAUSE OF ACTION

**Alien Tort Statute ("ATS")**

**28 U.S.C. §1350**
**Involuntary Servitude and Forced Labor**

121.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 120 as if set forth fully herein.

122.    Plaintiffs, who are aliens, bring this claim against all the Defendants.

123.    This Court has jurisdiction over the alleged violations of international law pursuant to the Alien Tort Statute, 28 U.S.C. §1350.

124.    Defendants subjected Plaintiffs to involuntary servitude and/or forced labor, which are violations of the law of nations, including customary international law as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

125.    The Convention Concerning Forced or Compulsory Labor defines forced labor as "all work or service which is exacted from any person under the menace of any penalty and for which said person has not offered himself voluntarily."

126.    The above-named Defendants engaged in acts including, but not limited to, manipulation of legal documents, psychological coercion, and abuse and threatened abuse of the legal process, to exact  work or service from the Plaintiffs which the Plaintiffs had not offered voluntarily.

127.    Aiding and abetting involuntary servitude and forced labor is also in violation of the law of nations and treaties of the United States and is actionable under the Alien Tort Statute, 28 U.S.C. §1350.

128.    Defendants Colamussi and Villanueva, at the very least, aided and abetted the imposition of involuntary servitude and/or forced labor by directing, ordering, conspiring to commit, or aiding the imposition of involuntary servitude and/or forced labor.

129.    Plaintiffs are entitled to compensatory and punitive damages in an amount to be determined at trial and any other relief deemed appropriate.

## FOURTH CAUSE OF ACTION

### Alien Tort Statute ("ATS")
### 28 U.S.C. §1350
### Human Trafficking

130.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 120 as if set forth fully herein.

131.    Plaintiffs, who are aliens, bring this claim against all the Defendants.

132.    This Court has jurisdiction over the alleged violations of international law pursuant to the Alien Tort Statute, 28 U.S.C. §1350.

133.    Defendants engaged in human trafficking, which is a violation of the law of nations, including customary international law as reflected, expressed and defined in multilateral treaties and other international instruments, international and domestic judicial decisions and other authorities.

134.    The leading international instrument on the subject defines human trafficking as:

[T]he recruitment, transportation, transfer, harboring, or receipt of persons by means of the threat or use of force or other forms of coercion, of abduction, of fraud, of deception, of the abuse of power or of a position of vulnerability or of the giving or receiving of payments or benefits to achieve the consent of a person having control over another person, for the purpose of exploitation. (The Protocol to Prevent, Suppress, and Punish Trafficking in Persons, Especially Women and Children, supplementing the United Nations Convention Against Transnational Crime, art 1, Nov. 15, 2003, 55 U.N. GAOR Supp (No. 49) at 60, U.N. Doc. A/45/49 (Vol I) (2001) 40 I.L.M. 355.)

135.    Defendants engaged in acts including, but not limited to, the recruitment, transportation, transfer, harboring, or receipt of Plaintiffs.  These acts were conducted through

the use of the threat of force, coercion, fraud, deception, and the abuse of power and/or a position of vulnerability.

136.    Defendants trafficked Plaintiffs for the purpose of obtaining forced labor or services.

137.    Aiding and abetting human trafficking is also in violation of the law of nations and treaties of the United States, and is actionable under the Alien Tort Statute, 28 U.S.C. §1350.

138.    Defendants Colamussi and Villanueva, at the very least, aided and abetted human trafficking by directing, ordering, conspiring to commit, or aiding human trafficking.

139.    Plaintiffs are entitled to compensatory and punitive damages in an amount to be determined at trial and any other relief deemed appropriate.

### FIFTH CAUSE OF ACTION

**New York Labor Law ("NYLL) Minimum Wage**
**N.Y. Lab. Law §652**
**(By Plaintiffs Belvis and De Leon)**

140.    Plaintiffs Belvis and De Leon re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 103 as if set forth fully herein.

141.    Defendants did not pay Belvis and De Leon the proper minimum wages for all the time that they were suffered or permitted to work each workweek.

142.    During their employment, Belvis and De Leon generally worked an average of between fifty (50) and sixty five (65) hours per week.  Belvis had to do marketing for the Defendants' restaurants in the early mornings, and both of them had to continue working even past their workshifts at night as Defendants required them to assist the dishwashers in the next-door restaurant also owned by Defendants.

143.     The minimum wage provisions of Article 19 of the New York Labor Law and the supporting New York State Department of Labor Regulations apply to Defendants, and protect the Plaintiffs.

144.     Defendants have failed to pay Plaintiffs the minimum hourly wages to which they were entitled under the NYLL and the supporting New York State Department of Labor Regulations.

145.     Pursuant to the NYLL, Article 19, §§ 650 et seq., and the supporting New York State Department of Labor Regulations, Defendants have been required to pay Plaintiffs the full minimum wage at a rate of $7.25 per hour for all hours worked from July 24, 2009 through December 30, 2013; and $8.00 per hour for all hours worked from December 31, 2013 through 2014.

146.     Through their knowing or intentional failure to pay minimum hourly wages to the Plaintiffs, Defendants have willfully violated the NYLL, Article 19, §§ 650 et seq., and the supporting New York State Department of Labor Regulations.

147.     Due to Defendants' willful violations of the NYLL, Plaintiffs are entitled to recover from Defendants their unpaid minimum wages, liquidated damages as provided for by the NYLL, reasonable attorney's fees, costs, and pre-judgment and post-judgment interest.

## SIXTH CAUSE OF ACTION

### New York Labor Law ("NYLL) Unpaid Overtime
### N.Y. Lab. Law Article 19
### (By Plaintiffs Belvis and De Leon)

148.     Plaintiffs Belvis and De Leon re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 103 as if set forth fully herein.

149. Defendants did not pay Belvis and De Leon the proper overtime wages for all the time that they were suffered or permitted to work each workweek.

150. During their employment, Belvis and De Leon generally worked an average of between fifty (50) and sixty five (65) hours per week. Belvis had to do marketing for the Defendants' restaurants in the early mornings, and both of them had to continue working even past their workshifts at night as Defendants required them to assist the dishwashers in the next-door restaurant also owned by Defendants.

151. During such workweeks, Defendants did not compensate Belvis and De Leon at time and a half the full minimum wage rate for all of the overtime hours each worked.

152. The overtime wage provisions of Article 19 of the New York Labor Law and its supporting regulations apply to Defendants, and protect Plaintiffs Belvis and De Leon.

153. Defendants have failed to pay Plaintiffs the premium overtime wages to which they are entitled under the NYLL and the supporting New York State Department of Labor Regulations for all hours worked beyond 40 hours per workweek.

154. Defendants have failed to keep, make, preserve, maintain and furnish accurate records of time worked by Plaintiffs.

155. Through their knowing or intentional failure to pay Plaintiffs overtime wages for hours worked in excess of 40 hours per workweek, Defendants have willfully violated the NYLL, Article 19, §§ 650 *et seq.*, and the supporting New York State Department of Labor Regulations.

156. Due to Defendants' willful violations of the NYLL, Plaintiffs are entitled to recover from Defendants their unpaid overtime wages, liquidated damages as provided for by the

NYLL, reasonable attorney's fees and costs of the action, and pre-judgment and post-judgment interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief:

1.     Declaratory and injunctive relief;

2.     Compensatory damages, punitive damages, attorneys' fees and costs;

3.     As to Plaintiffs Belvis and De Leon, unpaid minimum wages, overtime pay, and liquidated damages permitted by law pursuant to the NYLL and the supporting New York State Department of Labor Regulations;

4.     Pre-judgment and post-judgment interest; and

5.     Such other relief as this Court shall deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on each and every claim set forth herein.

Respectfully submitted.
December 31, 2015. Woodside, New York.

LAW OFFICE OF FELIX VINLUAN

By:

FELIX Q. VINLUAN (FV6788)
MANUEL B. QUINTAL (MQ5186)
69-10 Roosevelt Avenue, 2nd Floor
Woodside, NY 11377
Tel. No. 718-478-4488
Fax No. 718-478-4488
Email: fqvinluan@yahoo.com

*Counsel for the Plaintiffs*

## VERIFICATION

STATE OF NEW YORK   )
                     S.S.:
COUNTY OF QUEENS    )

    **I, LUIS I. BELVIS,** of legal age and residing at 183-27 Dalny Road, Jamaica, NY 11432, after having been sworn in accordance with law, hereby state that I am one of the plaintiffs in the within action.  I have read the foregoing Complaint and know the contents thereof (except as to those that specifically pertain the other plaintiffs).   The contents are true to my knowledge, except as to matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true.

LUIS E. BELVIS

Sworn to and subscribed before me
on JANUARY 9 , 2016

FELIX Q. VINLUAN
Notary Public, State of New York
No. 02VI6129101
Qualified in Nassau County
Commission Expires June 20, 2017

24

## VERIFICATION

STATE OF NEVADA         )

COUNTY OF _Washoe_    )         S.S.:

    **I, RAUL F. DE LEON,** of legal age and residing at 4900 Koenig Road, Reno, NV 89506, after having been sworn in accordance with law, hereby state that I am one of the plaintiffs in the within action.   I have read the foregoing Complaint and know the contents thereof (except as to those that specifically pertain to the other plaintiffs).   The contents are true to my knowledge, except as to matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true.

RAUL F. DE LEON

Sworn to and subscribed before me
on _December 31_, 2015

CASSANDRA ARKEBAUER
NOTARY PUBLIC
STATE OF NEVADA
Appt. No. 15-2682-2
My Appt. Expires June 15, 2019

## VERIFICATION

STATE OF NEW YORK   )

                              S.S.:

COUNTY OF QUEENS   )

     **I, CYD RICH C. RECENTE,** of legal age and residing at 39-12 63rd Street, Woodside, NY 11377, after having been sworn in accordance with law, hereby state that I am one of the plaintiffs in the within action.  I have read the foregoing Complaint and know the contents thereof (except as to those that specifically pertain to the other plaintiffs).   The contents are true to my knowledge, except as to matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true.

                                                   CYD RICH C. RECENTE

Sworn to and subscribed before me
on JANUARY  11 , 2016

FELIX Q. VINLUAN
Notary Public, State of New York
No. 02VI6129101
Qualified in Nassau County
Commission Expires June 20, 2017

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

LUIS I. BELVIS, RAUL F. DE LEON,
and CYD RICH C. RECENTE,

*Plaintiffs*,

- against -                                    Docket No. 16-cv-_____

RALPH COLAMUSSI, HISTORICAL
THATCHED COTTAGE CATERERS, INC.,
JOE'S FRIENDLY SERVICES & SON, INC.,
d/b/a HISTORICAL THATCHED COTTAGE,
and ROBERTO VILLANUEVA,

*Defendants*

-----------------------------------------------------------------X

# COMPLAINT

---------------------------------------------------------------------------------------------------

Pursuant to 22 NYCRR 130-1.1-a, the undersigned, an attorney admitted to practice in the courts of New York State, certifies that upon information and belief and reasonable inquiry, the contentions contained in the annexed document are not frivolous and that if the annexed document is an initiating pleading, the matter was not obtained through illegal conduct, or that if it was, the attorney or other persons responsible for the illegal conduct are not participating in the manner or sharing in any fee earned therefrom, and that if the matter involves potential claims for injury or wrongful death, the matter was not obtained in violation of 22 NYCRR 1200.41-a.

LAW OFFICE OF FELIX VINLUAN

FELIX Q. VINLUAN (FV6788)
69-10 Roosevelt Ave., 2nd Floor
Woodside, NY 11377
Tel. No. 718-478-4488
Fax No. 718-478-4588
Email: fqvinluan@yahoo.com

*Attorneys for the Plaintiff*