UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
LUIS I. BELVIS, RAUL F. DE LEON, and
CYD RICH C. RECENTE,

                        Plaintiffs,                  **REPORT AND**
                                                            **RECOMMENDATION**
        -against-                         CV 16-544 (JFB)(ARL)

RALPH COLAMUSSI, HISTORICAL THATCHED
COTTAGE CATERERS, INC., JOE'S FRIENDLY
SERVICES & SON, INC. *doing business as*
HISTORICAL THATCHED COTTAGE, and
ROBERTO VILLANUEVA,

                        Defendants.
----------------------------------------------------------------X
**LINDSAY, Magistrate Judge:**

      This matter was referred to the undersigned by District Judge Bianco for the purpose of issuing a report and recommendation as to the appropriate damages to be awarded to the plaintiffs. The plaintiffs have submitted a memorandum of law, the affidavits of Luis Belvis ("Belvis"), Raul F. De Leon ("De Leon"), Cyd Rich C. Recente ("Recente"), and Stephen Reich, Ph.D., ("Dr. Reich"), as well as other exhibits in support of their motion. Despite having been served with the motion for a default judgment, the defendants have not responded. Based upon the evidence submitted, the undersigned respectfully recommends that a judgment be entered against the defendants, Ralph Colamussi ("Colamussi"), Historical Thatched Cottage Caterers, Inc. ("Thatched Cottage"), and Joe's Friendly Services & Son, Inc. doing business as Historical Thatched Cottage ("Joe's"), in favor of the plaintiffs as follows:

      (1) Belvis to be awarded $125,460.60, comprised of $3,216.00 in unpaid wages, $21,466.80 in overtime pay, $24,682.80 in liquidated damages, and $76,095.00 in emotional distress damages;

      (2) De Leon to be awarded $38,334.60, comprised of $5,769.60 in unpaid

wages, $6,130.20 in overtime pay, $11,899.80 in liquidated damages, and $14,535.00 in emotional distress damages; and

(3) Recente to be awarded $14,064.60, comprised of $4,659.60 in lost wages and $9,405.00 in emotional distress damages.

## BACKGROUND

### A. Factual Background

The plaintiffs are citizens of the Philippines who lawfully entered the United States between 2012 and 2014 with H-2B visas in order to work as waiters at the Thatched Cottage. Compl. ¶¶ 7-9. Belvis and Recente currently reside in Queens County, New York, and De Leon resides in Palm Beach Gardens, Florida. *Id.;* Recente Aff. The defendant, Colamussi, is the owner and president of the corporate defendants, Thatched Cottage and Joe's, both of which are engaged in the restaurant and catering business. Compl. ¶¶ 10-4. Named defendant Roberto Villanueva ("Villanueva"), is alleged to be an agent of Colamussi, but was never served with the complaint. *Id.* ¶ 16; ECF No. 10.

In early 2012, Colamussi and Villanueva began recruiting people from the Philippines and the United Arab Emirates to work as waiters and servers at the defendants' restaurants. Compl. ¶ 20-1; Belvis Aff. ¶ 3. On or about May 2012, Thatched Cottage submitted a petition to the U.S. Citizenship and Immigration Services ("USCIS") to bring eleven workers to the United States with H-2B visas to perform services and labor. Belvis Aff., Ex. 1. The petition was approved in June. *Id.* In July 2013, Joe's received a similar approval to bring nineteen workers to the country on H-2B visas. De Leon Aff., Ex. 1. Joe's then received a second approval notice from the USCIS in September 2014 to bring an additional fifteen workers to the country. Recente Aff., Ex. 1. Although the plaintiffs' backgrounds and stories vary, each of

2

the plaintiffs claims that during the recruitment process, Villanueva, Colamussi, and/or their Philippine-based associates, provided them with false information about the terms and conditions of their employment to induce them to work in the United States. Compl. ¶ 21. In addition, the plaintiffs all complain that they were required to incur significant debt in order to come to the United States. *Id.* Specifically, the plaintiffs allege that they were each required to pay a placement fee to the defendants to cover the cost of, among other things, the U.S. Embassy visa application fee, the medical examination fee, and the Philippine Overseas Employment Administration ("POEA") fee. *Id.* ¶ 22; Belvis Aff. ¶ 4. Moreover, in order to pay the placement fees, the plaintiffs state that they had to borrow money from lenders and/or relatives. Compl. ¶ 22.

The plaintiffs further contend that Colamussi and Villanueva provided the government with inaccurate information on the H-2B visa applications, including the location of their jobs and the amount of pay. Compl. ¶ 21. In addition, several of the plaintiffs claim that once they arrived in the United States, they were required to live in unsafe conditions. *Id.* ¶ 23. Finally, the plaintiffs all claim to have suffered emotional distress a result of the defendants' coercive tactics resulting in their forced labor, the effects of which include disrupted sleep, nightmares, feelings of fear, difficultly developing trust, anxiety, depression, difficulty concentrating and stress. Belvis Aff. ¶¶ 28-9; De Leon Aff. ¶¶ 27-28; Recente Aff. ¶¶ 29-30.

Nevertheless, since the plaintiffs' work and living conditions differed slightly, the court will address each of the plaintiff's experiences separately.

*1. Luis Belvis*

Belvis arrived in New York on September 19, 2012, and was driven straight from the

airport to meet Colamussi at one of his restaurants. Belvis Aff. ¶ 9. On the day of his arrival, Belvis was told to bring his belongings to an apartment in Huntington, which he was required to share with four other H-2B workers for $200 per month. *Id.* ¶ 11. He was then assigned to work at a neighboring restaurant owned by Colamussi called the Jelly Fish, where he was made to perform dishwashing responsibilities. Id. ¶¶ 10, 12. According to Belvis, on many occasions, when he was finished with his job at the Jelly Fish, Colamussi would also require him to wash dishes at the Thatched Cottage. *Id.* ¶ 12.

In December 2012, just before his temporary visa was set to expire, the defendants promised to sponsor Belvis as an H-IB worker.[1] *Id.* ¶ 13. Belvis avers that the filing season for H-1B workers did not open until April 1, 2013, so, on the advice of the defendants, he applied to change his status to F-1.[2] *Id.* ¶ 13. However, in order to change his status, the defendants told him to borrow $10,000 and place it in a bank account. *Id.* ¶ 14.

Belvis also contends that he was often forced to work without proper compensation. *Id.* ¶ 15. In this regard, he avers that prior to leaving the Philippines, he signed an offer of employment, which guaranteed him 40 hours of work per week at the Thatched Cottage, a straight time rate of $8.04 per hour, and an overtime rate of $12.06. *Id.* ¶ 7, Ex. 2. He was also told that his meals would be free during the workday. *Id.* However, starting in early 2013, Colamussi would occasionally fail to pay him on time and his payroll checks would sometimes bounce.[3] *Id.* ¶ 15. In addition, although he consistently worked for 50 to 65 hours per week, he

---

[1] According to the USCIS webpage, H-1B status is available for specialty occupations and employees must have a bachelor's degree or the equivalent experience.
[2] According to the USCIS webpage, foreign students pursuing academic studies and/or language training programs are classified as F-1 nonimmigrants, and may be eligible to work under certain conditions. On its surface, Belvis' F-1 application appears to have been approved, but Belvis is unsure if was ever filed. Belvis Aff. ¶ 14, Ex. 4.
[3] According to Belvis, several of his payroll check came from the accounts of other restaurants or catering services owned by Colamussi. Belvis Aff. ¶16.

4

was never paid overtime. *Id.* ¶ 15.

In the summer of 2013, Colamussi bought Belvis to stay at his house in Northport and forced him to reside in the basement without hot water or sufficient heat. *Id.* ¶ 19. Colamussi also required Belvis to purchase groceries for the restaurants in the morning before work. *Id.* ¶ 20. When he started to complain to Colamussi and Villanueva that he was not being paid properly given his extra marketing responsibilities and the overtime he was doing, the defendants threatened to cancel his H-1B sponsorship, to report to immigration authorities and to get him deported. *Id.* ¶¶ 21-23. Belvis avers that he felt compelled to continue working for the defendants because he was scared to lose his immigration status and to be deported. *Id.* ¶ 23.

Beginning in April 2014, Colamussi stopped paying Belvis altogether despite the fact that he continued to work 60 hours per week. *Id.* ¶ 25. In May, Belvis then learned that he was never sponsored as an H-1B employee by Colamussi or any of his restaurants. *Id.* ¶ 26. Nor had the defendants ever changed his immigration status to F-1. *Id.* Accordingly, he left Colamussi's house and immediately stopped working for the defendants. *Id.* ¶ 27.

2. *Raul De Leon*

In the summer of 2013, De Leon was recruited from the Philippines to work as a waiter for the defendant Joe's. De Leon Aff. ¶¶ 3, 6. Following his meeting with Villanueva at a hotel in Quezon City, the defendants forwarded De Leon an offer of employment that guaranteed him a job as a waiter for 40 hours per week at a rate of $12.02 per hour, plus $18.03 per hour for any overtime. *Id.* ¶¶ 4, 6, 9, Ex. 3. In addition, the offer of employment provided that Thatched Cottage would pay for his travel expenses and feed him during the workday. *Id.* ¶ 9. Like Belvis, he too was required to pay the defendants a recruitment fee of $3000, money which

5

he borrowed from family and friends. *Id.* ¶¶ 4, 6.

On November 29, 2013, the U.S. Embassy in Manilla granted De Leon's H-2B visa application, and he arrived in New York on December 16, 2013. *Id.* ¶ 10. Villanueva met De Leon at the airport and drove him, along with another H-2B employee, Mark Hernandez, to meet Colamussi at his restaurant. *Id.* Colamussi told him he would be working as a dishwasher at the Jelly Fish, not as a waiter at the Thatched Cottage, and would be living in the basement of his home. *Id.* ¶¶ 11-2. Like Belvis, De Leon complains that Colamussi's basement did not have hot water or sufficient heat. *Id.* ¶ 11.

Although De Leon did not sign the offer of employment until December 12, 2013, the term of his employment was set to expire on December 31, 2013. *Id.* ¶ 9, Ex. 3. Nevertheless, at some point before December 31, 2013, Colamussi and Villanueva promised to extend his H-2B status as long as he continued to work for them. *Id.* ¶ 14. De Leon explains that, as a newcomer to the United States unfamiliar with immigration laws, he was initially grateful to the defendants. *Id.* ¶ 15. However, as soon as he started working, he was required to work an average of 60 hours per week as a dishwasher at both the Jelly Fish and the Thatched Cottage and to remove snow and ice from the gutters and roofs at both restaurants. *Id.* ¶¶ 15-6.

De Leon says that sometime in January 2014, his paychecks also started to bounce. *Id.* ¶ 17. When he complained that he was not being paid properly and demanded overtime pay, the defendants threatened him with cancellation or withdrawal of his H-2B extension sponsorship and with being reported to immigration authorities. *Id.* ¶¶ 19-21. Accordingly, De Leon avers that he felt compelled to continue working for the defendants. *Id.* ¶ 22. But immediately after he began to complain, all of his checks started to bounce. *Id.* ¶ 23. In fact, De Leon was not

paid any wages from late January 2014 through April 30, 2014, so he also quit and moved out of Colamussi's house. *Id.* ¶¶ 23-6.

### 3. Cyd Rich C. Recente

Unlike Belvis and De Leon, Recente was living in the United Arab Emirates when she was recruited. Recente Aff. ¶ 4. According to Recente, Villanueva met her father, a Philippine national, in New York. *Id.* When her father told Villanueva that he had two daughters living in Dubai, Villanueva indicated that he had been bringing Filipino temporary workers to New York and could bring Recente and her sister to the United States. *Id.* ¶¶ 5-6. In July, Recente's father gave Villanueva $3,000 to sponsor her sister and $3,500 to sponsor her. *Id.* ¶¶ 7-9. On July 15, 2014, Recente and her sister left their jobs in Dubai and went to Philippines to meet Villanueva's associates. *Id.* ¶¶ 11-2.

Upon her arrival, Recente was advised that she would have to undergo training as a waitress before she could work on Long Island so she was put to work in a Manila restaurant for almost two months. *Id.* ¶ 12. During the entire time she was in Manila, Recente was not compensated at all and was forced to reside in Villanueva's associates' office. *Id.* ¶¶ 13-4. After she had been working for about a month without pay, Recente demanded to be compensated, but was told that working in the Manila restaurant was part of the deal for H-2B sponsorship, which they threatened to cancel. *Id.* ¶ 15. Accordingly, Recente says she stopped complaining, worked an additional month without pay and waited for her visa interview. *Id.* ¶¶ 16-7.

In the meantime, Recente's father became apprehensive and began to contact Villanueva to discuss the delay in scheduling both his daughter's visa interviews. *Id.* ¶ 18. Despite his

7

efforts, in the end of September, only Recente was given an interview. *Id.* ¶¶ 18-9. Shortly thereafter, Recente finally received some documentation regarding her H-2B sponsorship. *Id.* ¶ 20. The documentation included the final determination by the U.S. Department of Labor approving Joe's labor certification application for fifteen servers at a wage rate of $10.59 per hour. *Id.* The documentation also indicated that the duration of employment was until December 31, 2014. *Id.*

Finally, on October 1, 2014, Recente was given a visa to enter the United States and work at Joe's. *Id.* ¶ 21; Recente Ex. 2. On October 8, 2014, Recente entered the country and was told that Villanueva would meet her at the airport. *Id.* ¶ 22. But, Villanueva did not show up. *Id.* ¶ 23. In fact, Recente and her father were unable to reach Villanueva until sometime in November and, when they did, he was unable to say when Recente could start working. *Id.* ¶¶ 24, 27. Villanueva did, however, tell Recente that because her H-2B visa was due to expire on December 31, 2014, she should open a bank account in order to have identification in the United States. *Id.* ¶¶ 25-6. Villanueva also promised to work on an extension of her H-2B status. *Id.* ¶ 27. After that one meeting, Villanueva never communicated with Recente again. *Id.* ¶ 28.

### B. Procedural Background

On February 3, 2016, the plaintiffs commenced this action against the defendants pursuant to the Trafficking Victims Protection Reauthorization Act ("TVPA"), 18 U.S.C. §§ 1589 and 1590, the Alien Tort Statute, 28 U.S.C. § 1350, and the New York Labor Law. ECF No. 1. On March 5, 2016, the plaintiffs personally served Colamussi at his home in Northport. ECF No. 7. Thatched Cottage and Joe's were served on the same day, by service on their duly authorized agent, Colamussi. ECF Nos. 8, 9. Despite proper service, the defendants have not

8

answered or responded to the complaint. On November 14, 2017, the Clerk of this Court entered default against Colamussi, Thatched Cottage and Joe's pursuant to plaintiffs' Request for a Certificate of Default and Federal Rule of Civil Procedure 55. ECF No. 13. Shortly thereafter, the plaintiffs filed the motion now before the Court.

By order dated March 20, 2017, the defendants were directed to show cause, in writing, as to why a default judgment should not be entered. Judge Bianco indicated that a failure to respond would result in the entry of default judgment. On April 20, 2017, counsel for the plaintiffs filed proof of service of the order to show cause at the Court's request.[4] ECF No. 22. Accordingly, by order dated April 27, 2017, Judge Bianco granted the plaintiffs' motion for a default judgment and referred this matter to the undersigned for a determination of damages.

## DISCUSSION

### A. Legal Standard Governing Defaults

Federal Rule of Civil Procedure 55 establishes a two-step process regarding default judgments. First, the Clerk of the Court enters the party's default. Then, as here, a motion for a default judgment is made to the district court judge. A default constitutes an admission of all well-pleaded factual allegations in the complaint, except those relating to damages. *See Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992); *see also Joe Hand Promotions, Inc. v. El Norteno Rest. Corp.*, No. 06-CV-1878, 2007 WL 2891016, at *2 (E.D.N.Y. Sept. 28, 2007) ("[A]ll well-pleaded factual allegations in the plaintiff's complaint pertaining to liability are deemed true"). However, a default also "effectively constitutes an admission that the damages were proximately caused by the defaulting party's

---

[4] The defendants were each served by regular mail at their last known addresses. The Court did not specify the method of service required for its Order.

9

conduct: that is, the acts pleaded in a complaint violated the laws upon which a claim is based and caused injuries as alleged." *Cablevision Sys. New York City Corp. v. Lokshin*, 980 F. Supp. 107, 111 (E.D.N.Y. 1997). The movant need only prove that the "compensation sought relate[s] to the damages that naturally flow from the injuries pleaded." *Greyhound*, 973 F.2d at 159.

### B. Damages Pursuant to the Trafficking Victims Protection Act

The plaintiffs seek to recover damages pursuant to the Trafficking Victims Protection Reauthorization Act ("TVPA"), 18 U.S.C. §§ 1589 and 1590.[5] As indicated above, the Court has already entered a default judgment against the defendants on all of the claims. However, to put this recommendation into context, the court notes that pursuant to 18 U.S.C. § 1589, a defendant is liable under the forced labor provision of the statute when he or she knowingly provides or obtains the labor or service of a person through one of the following prohibited means:

> (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
>
> (2) by means of serious harm or threats of serious harm to that person or another person;
>
> (3) by means of the abuse or threatened abuse of law or legal process; or
>
> (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

*Aguirre v. Best Care Agency, Inc.*, 961 F. Supp. 2d 427 (E.D.N.Y. 2013) (citing 18 U.S.C. § 1589(a) and *United States v. Sabhnani*, 599 F.3d 215, 241-44 (2nd Cir. 2010)). "'Abuse of the law or legal process' is the 'use of threats of legal action, whether administrative, civil, or

---

[5] The Court has determined that the plaintiffs are entitled to damages pursuant to the TVPA. Accordingly, the Court need not address the plaintiffs' entitlement to damages under the Alien Tort Statute or the New York Labor Law.

10

criminal, in any manner or for any purpose for which the law was not designed in order to coerce someone into working against that person's will.'" *Aguirre*, 961 F. Supp. 2d at 444 (E.D.N.Y. 2013)(citing Shukla, 2012 U.S. Dist. LEXIS at *5).

Where, as here, the plaintiffs were recruited by the defendants to work in the United States, the TVPA "also provides for liability of any person who 'knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter.'" *Franco v. Diaz*, 51 F. Supp. 3d 235, 246 (E.D.N.Y. 2014) (citing 18 U.S.C. § 1590(a)). Moreover, courts have consistently recognized a private right of action for violations of 18 U.S.C. §§ 1589 and 1590 and have determined that victims may recover damages and reasonable attorney's fees" in civil actions against the perpetrators.[6] *Ditullio v. Boehm*, 662 F.3d 1091, 1096 (9th Cir. 2011) (citing 18 U.S.C. § 1595). Indeed, the Ninth Circuit noted in *Ditullio* that the TVPA's civil remedy provision may include both compensatory damages and punitive damages. *Id.* With this background in mind, the Court addresses the plaintiffs' claims for damages.

1. *Wages and Unpaid Income*

Violators of the TVPA must pay "the full amount of the victim's losses," including "the greater of the gross income or value to the defendant of the victim's services or labor or the value of the victim's labor as guaranteed under the minimum wage." *Carazani v. Zegarra*, 972 F.Supp. 2d 1, 16 (D.D.C. 2013)(citing 18 U.S.C. § 1593(b)(3)). At a minimum, victims are to be compensated for the value of their services as guaranteed under the FLSA. *See Lagasan v. Al-*

---

[6] The Court notes, however, that "'[a]ny amount paid to a victim under an order of restitution shall be reduced by any amount later recovered as compensatory damages for the same loss by the victim in . . . any Federal civil proceeding . . . .'" *Kiwanuka v. Bakilana*, 844 F.Supp.2d 107, 116 (D.D.C. 2012)(citing 18 U.S.C. § 3664(j)(2)).

11

*Ghasel*, 92 F. Supp. 3d 445, 457 (E.D. Va. 2015)(citing 18 U.S.C. § 1593(b)(3)). The FLSA provides that "[a]ny employer who violates [the Act] shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, . . . their unpaid overpaid compensation, . . . and in an additional equal amount as liquidated damages." *Id.* (citing 29 U.S.C. § 216(b)). In situations where contractual salary provisions are unenforceable, the TVPA has adopted a methodology to calculate damages for forced labor based on the minimum wage at the time of employment. *Carazani*, 972 F.Supp.2d at 16. However, where, as here, the plaintiffs have also introduced an enforceable salary provision, victims are entitled to recover damages on contract theory alone. *Id.* (citing *Gurung v. Malhotra*, 851 F.Supp.2d 583, 590 (S.D.N.Y.2012)).

In this case, the plaintiffs seek a total of $177,859.80 in compensatory damages, which includes the following:

> (1) $3,216.00 in unpaid wages, $21,466.80 in overtime pay, and $24,682.80 in liquidated damages for Belvis;
>
> (2) $5,769.60 in unpaid wages, $6,130.20 in overtime pay, and $11,899.80 in liquidated damages for De Leon; and
>
> (3) 4,659.60 in lost wages for Recente.

Belvis signed an offer of employment that guaranteed him 40 hours of work per week, at $8.04 per hour, with an overtime rate of $12.06. Belvis Aff. ¶ 7, Ex. 2. Between April and June 2014, the defendants did not pay him his regular weekly rate of $321.60 amounting to $3,216.00. In addition, between 2012 and 2014, Belvis worked for a total of 89 weeks and was never paid for the 20 hours of overtime he averaged each week. *Id.* ¶ 32. Accordingly, Belvis is entitled to recover $21,466.80 in overtime pay.

Adding an equal amount for liquidated damages, the defendants are therefore liable to Belvis for $49,365.60.

De Leon also signed an offer of employment that guaranteed him 40 hours of work per week, at a rate of $12.02 per hour, with an overtime rate of $18.03. De Leon Aff. ¶ 9, Ex. 3. From January 2014 and April 2014, the defendants failed to pay his regular weekly rate of $480.80. *Id.* ¶ 33. In addition, for 15 weeks, De Leon claims to have worked an average of 60 hours per week and was never paid for the 20 hours of overtime he worked each week. *Id.* ¶ 32. Accordingly, De Leon is entitled to recover unpaid wages amounting to $5,769.60 and overtime pay amounting to $6,130.20. Adding an equal amount for liquidated damages, the defendants are therefore liable to De Leon for $23,799.60.

Finally, Recente is entitled to be compensated for the hours she was guaranteed to work before she left the Philippines. Unlike Belvis and De Leon, Recente did not execute an offer of employment. However, the immigration papers that were prepared by the defendants on her behalf make clear that, at a minimum, Recente was offered full time employment from October 8, 2014 through December 31, 2014, at a rate of $10.59 per hour. Accordingly, Recente is entitled to an award of $4,659.60.

    2.    *Emotional Distress Damages*

"The TVPA [also] recognizes emotional distress damages as a 'form of compensatory damages.'" *Carazani*, 972 F. Supp. 2d at 24–25 (awarding $433,200 in emotional distress damages against defaulting defendant); *Lagasan*, 92 F. Supp. 3d at 458 (awarding $400 per day

13

for emotional distress damages against defaulting defendant).[7] To determine emotional distress damages, courts typically examine "the duration and intensity of the emotional distress." *Carazani*, 972 F. Supp. 2d at 24 (citing *Mazengo v. Mzengi*, No. CIV 07-756, 2007 WL 8026882, at *7 (D.D.C. Dec. 20, 2007)). In addition, courts often consider the "sex, age, condition in life and any other fact indicating susceptibility of the injured person to [the] type of harm," including "false promises to provide a salary, health insurance, vacation time and a safe place to live and work." *Id.*

Additionally, courts may also "look to other awards in similar cases "to ensure that the award is within a reasonable range." *Id.* (citing *Shukla v. Sharma*, No. 07–CV–2972 (CBA)(CLP), 2012 WL 481796, at *14 (E.D.N.Y. Feb. 14, 2012)). In *Lagasan*, the Eastern District of Virginia Court noted the plaintiffs have been awarded damages for emotional distress in forced labor cases ranging from $410 to $780 per day. *Lagasan*, 92 F. Supp. 3d at 458 (surveying cases). The *Carazani* court similarly found that damages in forced labor cases ranged from $415 to $800 for each day of forced labor. *Carazani*, 972 F. Supp. 2d at 24. Here, the plaintiffs are each seeking $171 for each day of their forced labor (in the case of Recente, days she was waiting to be employed) based on the D.C. court's 2007 award in *Mazengo*, which they contend is the least amount of emotional damages they have found awarded in a forced labor case. *See Mazengo*, 2007 WL 8026882, at *7. Multiplied by the number of days they were "forced to work," Belvis is seeking $76,095 in emotional distress damages (445 days) and De Leon is seeking $14,535 in emotional distress damages (85 days), and Recente is seeking

---

[7] "Under the TVPA, 'the order of restitution shall direct the defendant to pay the victim ... the full amount of the victim's losses,' which include 'medical services relating to physical, psychiatric, or psychological care; ... physical and occupational therapy or rehabilitation; ... and any other losses suffered by the victim as a proximate result of the offense.'" *Carazani*, 972 F. Supp. 2d at 24–25 (citing 18 U.S.C. § 2259(b)(3)).

$9,405 in emotional distress damages based on the 55 days she was guaranteed employment under her H-2B visa. The Court finds these awards more than reasonable.

Each of the plaintiffs has established that they were trafficked by and/or forced into involuntary labor by the defendants. They all aver that as a result of the defendants' coercive tactics they suffer from disrupted sleep, nightmares, feelings of fear, difficultly developing trust, anxiety, depression, difficulty concentrating and stress. Belvis Aff. ¶¶ 28-9; De Leon Aff. ¶¶ 27-28; Recente Aff. ¶¶ 29-30. Dr. Stephen Reich, a licensed psychologist in New York, has treated both Belvis and Recente and reports that both patients now suffer from adjustment disorder with mixed anxiety and depressive moods. Belvis Aff. Ex. 7; Recente Aff. Ex. 3. Moreover, Dr. Reich concluded that there is a direct connection between the actions of the defendants and Belvis' and Recente's symptomology. *Id.*

De Leon also consulted with a mental health provider, Susan Loring. She concluded that De Leon has moderate "adjustment reaction of adult life" associated with the memory of his mistreatment by his employers. De Leon Aff. Ex. 6. She also found him to be hyperfocused on negative events. *Id.* It is clear from the plaintiffs' submissions that their emotional distress was the proximate result of the defendants' actions, and that they are therefore entitled to emotional distress damages under the TVPA. Moreover, their request for $171 per day falls below the range of emotional damages for trafficking victims held to forced labor. Accordingly, the undersigned respectfully recommends that in addition to the award for unpaid wages, overtime and liquidated damages, Belvis be awarded $76,095, De Leon be awarded $14,535, and Recente be awarded $9,405 in compensatory damages for emotional distress.

## OBJECTIONS

A copy of this Report and Recommendation is being electronically filed on the date below. Counsel for plaintiffs shall serve a copy of this Report and Recommendation on the defendants upon receipt and shall file proof of service with the court. Any objections to this Report and Recommendation must be filed with the Clerk of the Court with a courtesy copy to the undersigned within 14 days of service. Failure to file objections within this period waives the right to appeal the District Court's Order. *See* 28 U.S.C. §636(b)(1); FED. R. CIV. P. 72; *Beverly v. Walker*, 118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

Dated:   Central Islip, New York
        February 20, 2018

                                                                           _____s/_____
                                                                           ARLENE R. LINDSAY
                                                                           United States Magistrate Judge